UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

JOHN MONROQUE,

               Plaintiff,                       CASE NO.

vs.

NICHOLAS LORDI, WEST PALM BEACH
POLICE DEPARTMENT, and CITY OF
WEST PALM BEACH

               Defendants.

_____/

## **COMPLAINT**

Plaintiff, JOHN MONROQUE, by and through his undersigned counsel at KELLEY UUSTAL, sues Defendants Nicholas Lordi and Jamesloo Charles, who are West Palm Beach Police Department employees, the West Palm Beach Police Department, and the City of West Palm Beach, and states the following:

### INTRODUCTION

1. On November 1, 2019, Defendant Nicholas Lordi grabbed an unarmed 63-year-old John Monroque from behind, threw him onto a parked police cruiser, wrestled him to the ground, then punched him in the head approximately 11 times until Mr. Monroque lay bloody and immobile on the ground while Nicholas Lordi knelt on his head.

2. This civil action arises from Nicholas Lordi's excessive use of force against Plaintiff John Monroque, Officer Charles's failure to intervene, and the West Palm Beach Police Department's negligent supervision and retention of Nicholas Lordi.

## JURISDICTION AND VENUE

3.  This action is brought pursuant to 42 U.S.C. Section 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution along with several claims under Florida state law.

4.  This Court has jurisdiction pursuant to 28 U.S.C. §1331 and §1367. Venue is proper under 28 U.S.C. §1391(b). The events giving rise to this complained occurred in this judicial district.

5.  This is an action seeking damages in excess of seventy-five thousand dollars ($75,000.00), exclusive of costs, interest, and attorney's fees.

## PARTIES

6.  Plaintiff is a disabled 67-year-old resident of Palm Beach County, Florida, who retired from the City of West Palm Beach's Public Utilities department.

7.  At all relevant times, Defendants Nicholas Lordi and Jamesloo Charles ("Defendant Officers") were police employees of the West Palm Beach Police Department. Plaintiff sues these defendants in their individual capacities.

8.  Defendant West Palm Beach Police Department ("the Police Department") is and/or was the employer of each of the Defendant Officers.

9.  Defendant City of West Palm Beach ("the City") is a political subdivision of the State of Florida, a Florida municipal corporation, and all relevant times had ultimate authority over the West Palm Beach Police Department and the Defendant Officers.

10. Both the Police Department and the City, as well as the Florida Department of Financial Services, were provided with proper notice of this action pursuant to Fla. Stat. § 768.28.

2

## PLAINTIFF'S FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### Defendant Lordi's Internal Affairs History Prior to The Subject Incident

11. In 2015, the West Palm Beach Police Department hired Defendant Lordi as a police officer.

12. Between his hiring and the subject incident on November 1, 2019, Defendant Lordi was the subject of approximately 40 internal affairs investigations, including approximately 15 use of force incidents, and four citizen complaints. See Exhibit 1 (West Palm Beach Police Department, Concise Officer History, Officer Nicholas Lordi).

13.  Defendant Lordi was disciplined five separate times during this period. See Exhibit 2 (West Palm Beach Police Department, Officer Disciplinary History, Officer Nicholas Lordi).

14. The number of use of force investigations and citizen complaints made against Defendant Lordi during this period is an amount that "typically you would not see . . . in other police departments or other police officers." Exhibit 3 (Kamrel Eppinger & Matt Papaycik, Arrested West Palm Beach Police Officer Has History of Discipline Issues, Complaints, Documents Show, WPTV (Feb 17, 2022), https://www.wptv.com/news/region-c-palm-beach-county/west-palm-beach/arrested-west-palm-beach-officer-has-history-of-discipline-issues-complaints-documents-show).

15. Between 2018 and 2020, Defendant Lordi was one of only two officers in the Police Department to receive "three complaints in a single year." Exhibit 4 (Wayne Washington, How a West Palm Officer Got His Job Back After He Was Disciplined 15 Times and Fired, Palm Beach Post (Aug. 9, 2021),

https://www.palmbeachpost.com/story/news/local/westpb/2021/08/09/west-palm-beach-cop-disciplined-15-times-gets-job-back-after-firing/5473924001/).

**The Subject Incident**

16. On November 1, 2019, the Defendant Officers were on duty with the Police Department when they responded to an alleged trespass at the Food Plus grocery store located at 5501 Broadway Avenue in West Palm Beach, Florida.

17. Defendant Officers made contact with Mr. Monroque in the parking lot of the Food Plus grocery store and, after a brief conversation, Mr. Monroque turned and walked away from Defendant Officers and the store.

18. Mr. Monroque was unarmed and non-threatening.

19. While Mr. Monroque was talking to another civilian in the parking lot, Defendant Lordi approached him from behind, grabbed him from behind, and threw him onto the Defendant Officers' parked police car.



20. Defendant Officers then began slamming Mr. Monroque face-first onto the hood of their car, at which point Defendant Lordi put Mr. Monroque in a headlock and wrestled him to the ground.

21. While still having Mr. Monroque in a headlock on the ground, Defendant Lordi punched him in the head with a closed fist approximately six times.



22. Defendant Lordi then rolled Mr. Monroque over so that he lay face-first on the ground, and punched him with a closed fist approximately five more times in the back of the head. Mr. Monroque was completely motionless during this barrage of attacks.



23. Defendant Lordi was in the midst of landing his twelfth punch in the back of Mr. Monroque's head when a civilian bystander jumped in to stop him. The civilian had to physically grab Defendant Lordi to prevent further attacks on Mr. Monroque.

24. In the aftermath of Defendant Lordi's attack, Mr. Monroque was left lying unconscious and bleeding on the pavement.



25. Defendant Charles stood next to Mr. Monroque and Defendant Lordi, and never once tried to intervene his partner's beating of Mr. Monroque.

26. By failing to intervene, Defendant Charles violated the Police Department's Standard Operating Procedures for Use of Force incidents which states that "An officer has a duty to intervene to prevent or stop the use of excessive force by another officer when it is safe and reasonable to do so." Exhibit 5 (West Palm Beach Police Department Standard Operating Procedure III-13(V)(H))

27. A few minutes later, Defendant Lordi resumed his attack on Mr. Monroque, who was still lying on the pavement in handcuffs, by forcefully placing his knee and body weight on Mr. Monroque's head and neck.



28. Once again, Defendant Charles stood by Defendant Lordi and watched without intervening.

29. Defendant Charles' second failure to intervene again violated the Police Department's Standard Operating Procedures for Use of Force incidents.

30. By forcefully placing his knee, and body weight, on Mr. Monroque's head and neck while he was in handcuffs, Defendant Lordi also violated multiple Standard Operating Procedures for Use of Force Incidents.

31. He violated the rule on lateral vascular neck restraints which states that "The use of lateral vascular neck restraint can only be utilized when deadly force is authorized, and all other reasonable means of defense have been exhausted." Exhibit 5 (Standard Operating Procedure III-13(V)(C)).

32. He also violated the rule on handcuffed individuals which states that "Physical force shall not be used against individuals in restraints, except as objectively reasonable to prevent their escape or prevent imminent bodily injury to the individual, the officer, or another person. In these situations, only the minimal amount of force necessary to control the situation shall be used." Exhibit 5 (Standard Operating Procedure III-13(V)(H)).

33. After Defendant Lordi removed his knee from Mr. Monroque's head and neck, paramedics arrived, placed Mr. Monroque in a stretcher because he was unable to walk following Defendant Lordi's attack, and transported him to St. Mary's Hospital.

34. Defendant Lordi arrested and charged Mr. Monroque with battery on a police officer, and trespassing for the incident.

35. At least five civilians witnessed the incident. The Defendant Officers did not record any of the witnesses' names or take statements from any of them.



36. At least one of the civilian witnesses recorded the incident on their cellphone. The Defendant Officers did not obtain a copy of this video or report the existence of it.



37. The Food Plus grocery store's surveillance cameras recorded the incident. The Defendant Officers did not obtain a copy of it or report the existence of it.

## Investigations After the Subject Incident

38. In May 2020, the Florida Department of Law Enforcement, at the request of the Police Department, began investigating Defendant Lordi's attack on Mr. Monroque. See Exhibit 6 (Probable Cause Affidavit for State v. Lordi, Case No. 22CF001321AMB).

39. On January 5, 2021, the State of Florida dropped all of the charges Defendant Lordi had laid against Mr. Monroque.

40. On February 15, 2022, the Florida Department of Law Enforcement arrested and charged Defendant Lordi with aggravated battery causing bodily harm against Mr. Monroque.[1] *Id.*

41. The investigation concluded Defendant Lordi "used force in excess of that which was necessary to mitigate the incident, to place Monroque under arrest, and/or to protect himself or others, when he struck Monroque in the area of the head and face approximately eleven (11) times." *Id.*

42. The investigation also concluded Defendant Lordi "used force in excess of that which was necessary to mitigate the incident, to place Monroque under arrest, and/or to protect himself or others, when he placed his knee on Monroque's head." *Id.*

43. As a result of Defendant Lordi's attack, Mr. Monroque suffered serious mental, and physical injuries including a significant head injury, brain injury, a broken nose, and multiple facial contusions.

44. Mr. Monroque's head injury caused him to decompensate mentally following the attack, and he still suffers headaches, dizziness, and blackouts as a result.

---

[1] On April 27, 2021, approximately 72 days after Defendant Lordi's arrest, the State Attorney's Office announced they would not file the case.

## COUNT I – 42 U.S.C. §1983 Fourth Amendment
## (Excessive Force Claim Against Nicholas Lordi)

45. Plaintiff realleges and adopts, as if fully restated herein, the allegations in paragraphs 11 to 44.

46. As described in the preceding paragraphs, Defendant Lordi was acting under the color of law as a fully uniformed police officer when he used excessive force in violation of the Fourth Amendment to the United States Constitution, and 42 U.S.C., Section 1983, on Plaintiff.

47. The use of force by Defendant Lordi against Plaintiff was excessive, unreasonable, and unnecessary because Plaintiff did not pose a threat to anyone, did not have any weapon, and was calmly walking away from the scene.

48. Furthermore, the use of force by Defendant Lordi was excessive, unreasonable, and unnecessary because Defendant Lordi was investigating an alleged trespass, where no weapon, violence or threats were reported.

49. As demonstrated by the viciousness in Defendant Lordi's attack, Lordi's violation of Plaintiff's constitutional rights was done with malice, willfulness, and reckless indifference to Plaintiff's constitutional rights.

50. As a result of Defendant Charles's failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered severe psychological and/or emotional distress, physical injury, fright, fear, shock, pain, suffering, trauma, and was thereby rendered sick, sore, lame, and otherwise disabled or, in the alternative, the foregoing injuries thereby caused or contributed to cause an aggravation of a previous existing defect or infirmity; and as a direct result thereof, Plaintiff has suffered injuries resulting in pain and suffering,

disability, mental anguish, loss of capacity for the enjoyment of life, and inconvenience all of which conditions are permanent and continuing in nature.

51. As a further direct and proximate result of the above-mentioned unconstitutional acts, Plaintiff has in the past undergone and will in the future undergo painful and extensive medical care and treatment, and has in the past incurred, and will in the future incur, medical bills and expenses attendant to the injuries, as aforesaid.

WHEREFORE, Plaintiff demands damages in an amount in excess of seventy-five thousand dollars ($75,000), together with post-judgment interest and costs.

## COUNT II - 42 U.S.C. §1983 Fourth Amendment
### (Failure to Intervene Claim Against Jamesloo Charles)

52. Plaintiff realleges and adopts, as if fully restated herein, the allegations in paragraphs 11 to 44.

53. During the constitutional violations described herein, Defendant Charles stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though he had the opportunity to do so.

54. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and/or reckless indifference to Plaintiff's rights.

55. As a result of Defendant Charles's failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered severe psychological and/or emotional distress, physical injury, fright, fear, shock, pain, suffering, trauma, and was thereby rendered sick, sore, lame, and otherwise disabled or, in the alternative, the foregoing injuries thereby caused or contributed to cause an aggravation of a previous existing defect or infirmity; and as a direct result thereof, Plaintiff has suffered injuries resulting in pain and suffering,

disability, mental anguish, loss of capacity for the enjoyment of life, and inconvenience all of which conditions are permanent and continuing in nature.

56. As a further direct and proximate result of the above-mentioned unconstitutional acts, Plaintiff has in the past undergone and will in the future undergo painful and extensive medical care and treatment, and has in the past incurred, and will in the future incur, medical bills and expenses attendant to the injuries, as aforesaid.

WHEREFORE, Plaintiff demands damages in an amount in excess of seventy-five thousand dollars ($75,000), together with post-judgment interest and costs.

## **COUNT III – Battery Claim Against Nicholas Lordi**

57. Plaintiff realleges and adopts, as if fully restated herein, the allegations in paragraphs 11 to 44.

58. At all times material, Defendant Lordi intended to inflict a harmful or offensive contact with Plaintiff's body when he grabbed Plaintiff from behind, threw him onto a police cruiser, wrestled him to the ground, punched his head repeatedly from behind, then punched his head repeatedly while straddling him, and finally kneeling on his head as he lay bleeding on the ground.

59. The above-mentioned conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of Plaintiff.

60. Defendant Lordi's misconduct occurred without Plaintiff's consent or justification.

61. As a direct, proximate and foreseeable result of the aforementioned unpermitted contact by Defendant Lordi, Plaintiff suffered severe psychological and/or emotional distress, physical injury, fright, fear, shock, pain, suffering, trauma, and was thereby rendered sick, sore, lame, and otherwise disabled or, in the alternative, the foregoing injuries thereby caused or contributed to cause an aggravation of a previous existing defect or infirmity;

13

and as a direct result thereof, Plaintiff has suffered injuries resulting in pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, and inconvenience all of which conditions are permanent and continuing in nature.

62. As a further direct and proximate result of the above-mentioned unpermitted contact, Plaintiff has in the past undergone and will in the future undergo painful and extensive medical care and treatment, and has in the past incurred, and will in the future incur, medical bills and expenses attendant to the injuries, as aforesaid.

WHEREFORE, Plaintiff demands damages in an amount in excess of seventy-five thousand dollars ($75,000), together with post-judgment interest and costs.

### COUNT IV - Battery Claim Against the Police Department and the City
### (Respondeat Superior)

63. Plaintiff realleges and adopts, as if fully restated herein, the allegations in paragraphs 11 to 44 and 57 to 62.

64. At all times material, Defendant Lordi was an agent, servant and employee of the Police Department and the City.

65. The above-mentioned misconduct constitutes unlawful battery by Defendant Lordi on Plaintiff.

66. When Defendant Lordi battered Plaintiff, he was acting as a uniformed police officer on duty, within his scope of employment, and in furtherance of the Police Department's and the City's interest.

67. As a direct, proximate and foreseeable result of the aforementioned unpermitted contact by Defendant Lordi, Plaintiff suffered severe psychological and/or emotional distress, physical injury, fright, fear, shock, pain, suffering, trauma, and was thereby rendered sick, sore, lame, and otherwise disabled or, in the alternative, the foregoing injuries thereby

14

caused or contributed to cause an aggravation of a previous existing defect or infirmity; and as a direct result thereof, Plaintiff has suffered injuries resulting in pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, and inconvenience all of which conditions are permanent and continuing in nature.

68. As a further direct and proximate result of the above-mentioned unpermitted contact, Plaintiff has in the past undergone and will in the future undergo painful and extensive medical care and treatment, and has in the past incurred, and will in the future incur, medical bills and expenses attendant to the injuries, as aforesaid.

WHEREFORE, Plaintiff demands damages in an amount in excess of seventy-five thousand dollars ($75,000), together with post-judgment interest and costs.

### COUNT V – Intentional Infliction of Emotional Distress Claim Against Nicholas Lordi

69. Plaintiff realleges and adopts, as if fully restated herein, the allegations in paragraphs 11 to 44.

70. As described in the incorporated paragraphs, Defendant Lordi's battery on Plaintiff was deliberate, intentional and reckless.

71. Defendant Lordi's unjustified and excessive use of force on Plaintiff was outrageous, as it goes beyond all bounds of decency or police duty and is odious and utterly intolerable in a civilized community.

72. As a direct and proximate result of the foregoing, Plaintiff has suffered severe and ongoing emotional distress, mental disturbance, fright, revulsion, humiliation, emotional and psychological pain and suffering, mental anguish, inconvenience, and loss of capacity for the enjoyment of life, along with consequential damages as a result of the severe distress.

WHEREFORE, Plaintiff demands damages in an amount in excess of seventy-five thousand dollars ($75,000), together with post-judgment interest and costs.

## COUNT VI – Intentional Infliction of Emotional Distress Claim Against the Police Department and the City

73. Plaintiff realleges and adopts, as if fully restated herein, the allegations in paragraphs 11 to 44 and 69 to 72.

74. At all times material, Defendant Lordi was an agent, servant and employee of the Police Department and the City.

75. The above-mentioned misconduct constitutes intentional infliction of emotional distress by Defendant Lordi on Plaintiff.

76. When Defendant Lordi inflicted emotional distress on Plaintiff, he was acting as a uniformed police officer on duty, within his scope of employment, and in furtherance of the Police Department's and the City's interest.

77. As a direct and proximate result of the foregoing, Plaintiff has suffered severe and ongoing emotional distress, mental disturbance, fright, revulsion, humiliation, emotional and psychological pain and suffering, mental anguish, inconvenience, and loss of capacity for the enjoyment of life, along with consequential damages as a result of the severe distress.

WHEREFORE, Plaintiff demands damages in an amount in excess of seventy-five thousand dollars ($75,000), together with post-judgment interest and costs.

## COUNT VII – Grossly Negligent Supervision and Retention Claim Against the Police Department and the City

78. Plaintiff realleges and adopts, as if fully restated herein, the allegations in paragraphs 11 to 44.

79. At all times material, the Police Department and the City were responsible for implementing the rules and regulations in regard to hiring, screening, controlling, disciplining, retaining, and assigning police officers to their duties.

80. Prior to Defendant Lordi's unjustified attack of Plaintiff, the Police Department and the City received actual notice of Lordi's dangerous and incompetent propensities from numerous use-of-force investigations and citizen complaints, especially regarding Lordi's tendency to commit unjustified violence and use excessive force on civilians.

81. Despite having notice of Lordi's dangerousness and being able to foresee that Lordi would continue to batter and use excessive force on civilians, both the Police Department and the City acted negligently by failing to take any action to prevent Lordi from harming civilians such as Plaintiff.

82. This failure to act was grossly negligent and so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to Lordi's past and future conduct, including Plaintiff.

83. As a direct, proximate and foreseeable result of the aforementioned negligent supervision and retention of Defendant Lordi by the Police Department and the City, Plaintiff suffered severe psychological and/or emotional distress, physical injury, fright, fear, shock, pain, suffering, trauma, and was thereby rendered sick, sore, lame, and otherwise disabled or, in the alternative, the foregoing injuries thereby caused or contributed to cause an aggravation of a previous existing defect or infirmity; and as a direct result thereof, Plaintiff has suffered injuries resulting in pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, and inconvenience all of which conditions are permanent and continuing in nature.

84. As a further direct and proximate result of the above-mentioned negligent supervision and retention, Plaintiff has in the past undergone and will in the future undergo painful and

extensive medical care and treatment, and has in the past incurred, and will in the future incur, medical bills and expenses attendant to the injuries, as aforesaid.

WHEREFORE, Plaintiff demands damages in an amount in excess of seventy-five thousand dollars ($75,000), together with post-judgment interest and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff John Monroque respectfully requests:

a. Judgment for compensatory damages against all Defendants under all Counts;

b. Judgment for punitive damages against Defendant Lordi under Count I, III, and V; against Defendant Charles under Count II; and against Defendants Police Department and the City under Count VII;

c. Costs of suit;

d. Attorney fees;

e. Any and all other further relief as this Court may deem just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.


**Dated: August 22, 2023.**


Respectfully submitted,

**Kelley | Uustal**
500 North Federal Highway, Suite 200
Fort Lauderdale, Florida 33301
Telephone: (954) 522-6601
Facsimile: (954) 522-6608


By: _*Sean H. Parys*_____
Fan Li, Esq.
Florida Bar No. 118317

18

fli@kulaw.com
Sean Parys, Esq.
Florida Bar No. 1007701
shp@kulaw.com
*Counsel for Plaintiff*

FLI/bf

Exhibit 1

**Concise Officer History**

**Officer Nicholas Lordi [01979/01979]**

ID #: 01979  Hire date:
Current assignment(s):
    Bureau: Field Operations
    Division: Patrol Division
    Unit: Nights 1

**Involved Officer: Vehicle accident**
**Received: Feb 10, 2015**

IA No:  ACC 15-002

Case No:  2015000l396

**Involved Officer: Injured Person**
**Received: May 03, 2015**

IA No:

Case No:  2015-007610

**Involved Officer: Use of force**
**Received: Oct 27, 2015**

IA No:

Case No:  2015-0018105

| Use(s) of force | Effective/Not Effective |
|---|---|
| Escort to ground | Effective |

Service being conducted: Effecting Arrest   Disposition/finding: Justified Use of Force

**Involved Officer: Use of force**
**Received: Dec 13, 2015**

IA No:

Case No:  2015-0021112

| Use(s) of force | Effective/Not Effective |
|---|---|
| Tackle | Effective |

Service being conducted: Stopping Fight   Disposition/finding: Justified Use of Force

**Involved Officer: Use of force**
**Received: Feb 15, 2016**

IA No:

Case No:  20160002832

| Use(s) of force | Effective/Not Effective |
|---|---|
| Escort to ground | Effective |
| Hands/ Fist | Effective |

Service being conducted: Fleeing Officer on Foot   Disposition/finding: Justified Use of Force

**Involved Officer: Use of force**
**Received: Mar 27, 2016**

IA No:

Case No:  20160005563

| Use(s) of force | Effective/Not Effective |
|---|---|
| Tackle | Effective |

Service being conducted: Crowd Control   Disposition/finding: Justified Use of Force

**Involved Officer: Use of force**
**Received: Apr 26, 2016**

IA No:

Case No:  20160007600

**Involved Officer: Vehicle pursuit**
Received: Jul 23, 2016

IA No:

Case No:        20160013306

**Involved Officer: Vehicle pursuit**
Received: Dec 14, 2016

IA No:

Case No:        2016-0022523

**Involved Officer: Vehicle pursuit**
Received: Dec 15, 2016

IA No:

Case No:        2016-0022589

**Involved Officer: Vehicle pursuit**
Received: Dec 15, 2016

IA No:

Case No:        2016-0022589

**Involved Officer: Vehicle pursuit**
Received: Mar 12, 2017

IA No:

Case No:        2017-0004935

**Involved Officer: Use of force**
Received: Mar 12, 2017

IA No:

Case No:        2017-0004989

Use(s) of force            Effective/Not Effective
Escort to ground           Effective
Hands/ Fist                Effective

Service being conducted: Call for Service       Disposition/finding: Justified Use of Force

**Involved Officer: Vehicle pursuit**
Received: Jun 29, 2017

IA No:

Case No:        20170012630

**Involved Officer: Admin. Discipline**
Received: Jul 18, 2017

IA No:  AD 17-045

Case No:        2017-0010218

Allegations:

Body Camera   - III-20 Mobile Video Audio Recording Device (MVR) - Substantiated -
Jul 06, 2017
Negligence - R&R 05-07: Department Property Loss/Damage/Negligence -
Unsubstantiated - Jul 06, 2017

Actions taken:

: May 27, 2017 - Verbal Counsel/Platoon Folder

Lieutenant Dunleavy conducted verbal
counseling with involved officer.

**Involved Officer: Vehicle accident**
Received: Jul 18, 2017

IA No:  ACC 17-029

Case No:        2017-

0010218

**Involved Officer: Admin. Discipline**
Received: Oct 13, 2017

IA No:  AD 17-067

0016579                                           Case No:      2017-

    Allegations:

        Negligence - R&R 09-07: Conduct Towards the Public -
Substantiated - Oct 06, 2017

    Actions taken:

        : Oct 06, 2017 - Written Reprimand

                        B violation. Chief Mooney ordered written
                        repirmand.

                        Written reprimand signed

Involved Officer: Vehicle accident          IA No:   ACC 17-044
Received: Oct 13, 2017


Involved Officer: Vehicle pursuit           IA No:
Received: Mar 27, 2018
                                            Case No:      2018-
0005346

    Role Primary Investigator

Involved Officer: Vehicle pursuit           IA No:
Received: Apr 13, 2018
                                            Case No:      2018-
0006269

    Role Back-up

Involved Officer: Vehicle pursuit           IA No:
Received: Apr 20, 2018
                                            Case No:      2018-
0006749


Involved Officer: Use of force              IA No:
Received: Apr 29, 2018
                                            Case No:      2018-
0007302

    Role Back-up

    Use(s) of force          Effective/Not Effective
    Tackle                   Effective
    Other                    Effective
    Soft Control Technique   NOT effective

Service being conducted: Effecting Arrest    Disposition/finding:
Justified Use of Force

Involved Officer: Vehicle pursuit           IA No:
Received: May 30, 2018
                                            Case No:      2018-
0009127

    Role Back-up

Involved Officer: Use of force              IA No:
Received: May 31, 2018
                                            Case No:      2018-
0009182

**Role Back-up**

| Use(s) of force | Effective/Not Effective |
|---|---|
| Knee | Effective |
| Hands/ Fist | Effective |

Service being conducted: Effecting Arrest        Disposition/finding:
Justified Use of Force

Involved Officer: Use of force        IA No:
Received: Jun 13, 2018

Case No:        2018-

0009995

**Role Back-up**

| Use(s) of force | Effective/Not Effective |
|---|---|
| Escort to ground | Effective |
| Leg Sweep | Effective |

Service being conducted: Effecting Arrest        Disposition/finding:
Justified Use of Force

Involved Officer: Use of force        IA No:
Received: Oct 07, 2018

Case No:        2018-

0016561

**Role Back-up**

| Use(s) of force | Effective/Not Effective |
|---|---|
| Hands/ Fist | Effective |

Service being conducted: Effecting Arrest        Disposition/finding:
Justified Use of Force

Involved Officer: Use of force        IA No:
Received: Oct 22, 2018

Case No:        2018-

0017573

**Role Back-up**

| Use(s) of force | Effective/Not Effective |
|---|---|
| Soft Control Technique | Effective |

Service being conducted: Vehicle Stop        Disposition/finding:
Justified Use of Force

Involved Officer: Citizen Complaint/Inq.        IA No:  CCIF18-027
Received: Dec 17, 2018 08:00

Case No:        2018-

0020793

Allegations:

Violation Of Dept. Rules/Regs/Pol/Proc. - R&R 02-01: Standard
of Conduct - Unsubstantiated - Oct 15, 2019
Violation Of Dept. Rules/Regs/Pol/Proc. - R&R 02-11:
Obedience to Laws & Directives - Unsubstantiated - Oct 15, 2019
Violation Of Dept. Rules/Regs/Pol/Proc. - III-01 Arrest
Procedures - Substantiated - Oct 15, 2019
Body Camera  - III-20 Body Worn Camera (BWC)/ Movile Video
Recorder (MVR) - Substantiated - Oct 15, 2019

Actions taken:

: Oct 15, 2019 - Re-Training

Retraining on S.O.P. III-1: Arrest Procedures, to be conducted with Legal Advisor Dan Losey

: Oct 15, 2019 - Written Reprimand

Served to Ofc. Lordi on 10/16/19.

**Involved Officer: Vehicle pursuit**
**Received: Dec 25, 2018**                          **IA No:**

                                                    **Case No:**      **2018-**

**0021439**

Role Back-up

**Involved Officer: Use of force**
**Received: Jan 10, 2019**                          **IA No:**

                                                    **Case No:**

**20190000572**

Role Back-up

| Use(s) of force | Effective/Not Effective |
| Hands/ Fist | Effective |

Service being conducted: Effecting Arrest    Disposition/finding:
Justified Use of Force

**Involved Officer: Admin. Discipline**             **IA No:  AD 19-004**
**Received: Jan 19, 2019 08:00**
                                                    **Case No:**

**20190001158**

Allegations:

Negligence - R&R 05-07: Department Property
Loss/Damage/Negligence - Substantiated - Feb 21, 2019

Actions taken:

: Feb 21, 2019 - Verbal Counsel/Platoon Folder

**Involved Officer: Admin. Discipline**             **IA No:  AD 19-022**
**Received: Feb 26, 2019**

Allegations:

Negligence - R&R 09-07: Conduct Towards the Public -
Substantiated - Jun 25, 2019

Actions taken:

: Jun 25, 2019 - Written Reprimand

**Involved Officer: Admin. Discipline**             **IA No:  AD 19-029**
**Received: Feb 27, 2019**

Allegations:

Violation Of Dept. Rules/Regs/Pol/Proc. - R&R 02-11:
Obedience to Laws & Directives - Substantiated - Jun 25, 2019

Actions taken:

: Jun 25, 2019 - Verbal Counsel/Platoon Folder

Involved Officer: Use of force                    IA No:
Received: Apr 08, 2019
                                                  Case No:
20190006178

   Role Back-up

   Use(s) of force              Effective/Not Effective
   Appendage Restraint          Effective
   Hands/ Fist                  Effective

Service being conducted: Call for Service    Disposition/finding:
Justified Use of Force

Involved Officer: Citizen Complaint/Inq.      IA No:  CCIF 19-017
Received: May 05, 2019
                                              Case No:
20190007813

   Allegations:

     Violation Of Dept. Rules/Regs/Pol/Proc. - III-01 Arrest
Procedures - Unsubstantiated - Nov 01, 2019
     Violation Of Dept. Rules/Regs/Pol/Proc. - I-04 Racial and
Ethnic Profiling/Biased Based Policing - Unsubstantiated - Nov 01,
2019

Involved Officer: Citizen Complaint/Inq.      IA No:  CCIF 19-020
Received: Jun 28, 2019
                                              Case No:
20190011496

   Allegations:

     Conduct Towards Public - R&R 09-07: Conduct Towards the
Public - Substantiated - Oct 10, 2019
     Violation Of Dept. Rules/Regs/Pol/Proc. - III-18 Supervisor
Notification - Substantiated - Oct 10, 2019

   Actions taken:

    : Oct 10, 2019 - Written Reprimand

          Served on 10/16/2019.


Involved Officer: Use of force                IA No:
Received: Jul 21, 2019
                                              Case No:
20190012634

   Role Back-up

   Use(s) of force              Effective/Not Effective
   Leg Sweep                    Effective

Service being conducted: Disturbance     Disposition/finding:
Justified Use of Force

Involved Officer: Vehicle pursuit             IA No:
Received: Aug 20, 2019
                                              Case No:
20190014482

   Role Back-up

Involved Officer: Citizen Complaint/Inq.      IA No:  CCIF 19-027

**Received: Aug 23, 2019**                                 Case No:

**1900154628**

    Allegations:

        Violation Of Dept. Rules/Regs/Pol/Proc. - I-01 Code of
Conduct and Ethics of Police Department Members - Substantiated - Nov
23, 2019

    Actions taken:

      : Dec 06, 2019 - Written Reprimand

               On 12/6/2019 Chief Adderley ordered a written
               reprimand

**Involved Officer: Use of force**                    IA No:
**Received: Nov 01, 2019**
                                                      Case No:
**20190018771**

    **Role Primary Investigator**

    Use(s) of force            Effective/Not Effective
    Leg Sweep                  Effective
    Appendage Restraint        Effective
    Hands/ Fist                Effective

Service being conducted: Call for Service   Disposition/finding:
Justified Use of Force

**Involved Officer: Vehicle pursuit**                IA No:
**Received: Dec 10, 2019**
                                                     Case No:
**20190021005**

    **Role Back-up**

**Involved Officer: Use of force**                   IA No:
**Received: Dec 10, 2019**
                                                     Case No:
**20190021005**

    **Role Primary Investigator**

    Use(s) of force            Effective/Not Effective
    Escort to ground           Effective
    Leg Sweep                  Effective
    Hands/ Fist                Effective
    Appendage Restraint        Effective

Service being conducted: Vehicle Pursuit   Disposition/finding:

Report summary: totals by incident type:

| Incident type | Received |
|---|---|
| Admin. Discipline | 5 |
| Citizen Complaint/Inq. | 4 |
| Critical Incident Review | 0 |
| Discharge of Firearms | 0 |
| Discretionary arrest | 0 |
| Drug test | 0 |
| Firearm discharge | 0 |

| | |
|---|---|
| Firearms Discharge | 0 |
| Forced entry | 0 |
| Group Spray | 0 |
| Incident Review | 0 |
| Injured Person | 1 |
| Integrity test | 0 |
| Internal Affairs | 0 |
| K-9 Bite Case | 0 |
| K9 Utilization | 0 |
| Personnel Complaint | 0 |
| Show of force | 0 |
| Stop | 0 |
| Taser Deployment | 0 |
| Use of force | 15 |
| Vehicle accident | 3 |
| Vehicle pursuit | 12 |
| **Total** | **40** |

Printed: Mar 02, 2020 08:07   By: Sergeant Daniel Turner

# Exhibit 2

**West Palm Beach Police Department**

Internal Affairs

Officer Disciplinary History

Officer Nicholas Lordi [01979/01979]

---

### Part I - Personal Information

Name: Officer Nicholas  Lordi
ID #: 01979   Badge No: 01979   Hire Dt:

Bureau:  Field Operations
Division:  Patrol Division
Unit:  Nights 1

---

### Part II - Discipline History

**AD 17-045       Case #: 2017-0010218 Admin. Discipline**

> May 27, 2017: Verbal Counsel/Platoon Folder - [Action/discipline completed]

> Lieutenant Dunleavy conducted verbal counseling with involved officer.

**AD 17-067       Case #: 2017-0016579 Admin. Discipline**

> Oct 6, 2017: Written Reprimand - [Action/discipline completed]

> B violation. Chief Mooney ordered written reprimand.

> Written reprimand signed

**AD 19-004       Case #: 20190001158  Admin. Discipline**

> Feb 21, 2019: Verbal Counsel/Platoon Folder - [Action/discipline completed]

**AD 19-022       Admin. Discipline**

> Jun 25, 2019: Written Reprimand - [Action/discipline completed]

**AD 19-029       Admin. Discipline**

> Jun 25, 2019: Verbal Counsel/Platoon Folder - [Action/discipline completed]

Exhibit 3



WEST PALM BEACH

Menu

Watch Now

Quick links...

ADVERTISEMENT

NEWS  >  PALM BEACH COUNTY  >
REGION C PALM BEACH COUNTY  >  **WEST PALM BEACH**

# Arrested West Palm Beach police officer has history of discipline issues, complaints, documents show

Nicholas Lordi under arrest for aggravated battery related to 2019 incident

CLOSE

ADVERTISEMENT

00:05 / 01:34

WPTV is uncovering new details about a West Palm Beach police officer arrested for aggravated battery, accused of punching a man up to 11 times, breaking his nose, and jamming his knee into the victim's head.

 

 By: Kamrel Eppinger , Matt Papaycik

*Posted at 3:26 PM, Feb 17, 2022 and last updated 6:14 PM, Feb 17, 2022*

WEST PALM BEACH, Fla. — WPTV is uncovering new details about a **West Palm Beach police officer arrested for aggravated battery,** accused of punching a man up to 11 times, breaking his nose and jamming his knee into the victim's head.

Nicholas Lordi is out of jail on bond following his arrest Tuesday night.

WPTV pulled Lordi's personnel file from the West Palm Beach Police Department.

In addition to being involved in 15 use of force incidents, the documents showed that Lordi has been disciplined five times and has received four citizen complaints.

Recent Stories from wptv.com

CLOSE

ADVERTISEMENT

The Florida Department of Law Enforcement said Lordi used excessive force on John Monroque, 65, outside the Food Plus grocery store on Nov. 1, 2019.



ADVERTISEMENT

CLOSE

WPTV learned that two weeks before the incident, Lordi was written up and ordered to retrain after it was determined he violated the department's "arresting procedures" for not turning on his body camera.

In December 2019, current Police Chief Frank Adderly ordered that Lordi be written up after a citizen complaint that he violated the department's code of conduct and ethics.

Records showed that Lordi cursed at a suspect and mocked his stutter.

South Florida attorney Valentine Rodriguez is no stranger to suing police departments for misconduct of officers. He said Lordi's use of force and citizen complaints raise several red flags.

"I consider this to be a high number of complaints of force because the period of time is a short period of time," Rodriguez said. "Typically you would not see this in other police departments or other police officers."

WPTV contacted Michael Salnick, the attorney for Lordi. His office said there is no comment at this time.

Copyright 2022 Scripps Media, Inc. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Sign up for the **South Florida Sports Headlines Newsletter** and receive up to date information.

E-mail

Submit

CURATION BY

CLOSE

ADVERTISEMENT

Exhibit 4

# The Palm Beach Post

---

**WEST PALM BEACH**

# How a West Palm officer got his job back after he was disciplined 15 times and fired

 **Wayne Washington**
Palm Beach Post

Published 7:00 a.m. ET Aug. 9, 2021

The killing of George Floyd by a Minneapolis police officer last year led to nationwide calls for greater accountability for law enforcement and locally for the creation of civilian review boards.

But state laws and legal rulings in Florida have rendered civilian review boards largely powerless. And even if a chief of police wanted to fire an officer with a history of rule violations, it's not as simple as handing out a pink slip.

That reality is illustrated by the case of West Palm Beach police officer Frank Nelli, who has been counseled, reprimanded or disciplined 15 times for a series of violations during his 11-year career, according to documents reviewed by The Palm Beach Post.

Those violations include improper testing of his Taser, at-fault accidents with his police car, improperly completing paperwork and an arrest for domestic battery. A woman (records do not reveal her race or ethnicity) said Nelli, who is white, racially profiled her son and his friends. Another investigation found Nelli responded with vulgarity when he was asked by a gas station clerk to wear a mask before entering the station store.

West Palm Beach Police Chief Frank Adderley fired Nelli in August 2020 after the officer was accused of repeatedly working outside overtime when he was supposed to be on duty.

## Police union is able to get Frank Nelli reinstated

But the Police Benevolent Association – a powerful union many political leaders are eager to embrace – went to bat for Nelli, and an arbitrator reinstated him July 1. Arbitrator John

Markuns, a former administrative law judge, reduced Nelli's punishment to a 40-hour suspension and a six-month prohibition on working outside overtime.

The PBA attorney who represented Nelli, Brennan Keeler, described Nelli as "an excellent police officer."

"Nelli has had nothing less than satisfactory evaluations and countless awards/commendations" during his 11 years on the force, Keller wrote in an email to The Post. "I'm not sure what information you have or who provided it, but I'm sure you were not told (Officer) Nelli was also a recruiter and field training officer for many years. The (police department) utilized (Officer) Nelli as the face of its organization to bring in young, new talent to replenish the ranks.

"Furthermore, throughout the two years prior to his unlawful termination, (Officer) Nelli was a field training officer entrusted by the (department) to train these new recruits to face the rigors of police work in the City of West Palm Beach."

Nelli's reinstatement underscored the challenges departments face even when they want to rid themselves of officers who, given their history of rule violations, could later engage in conduct that could lead to the type of multimillion-dollar settlement paid by the city of Minneapolis after Floyd's killing.

## Chauvin case a costly settlement for Minneapolis

Derek Chauvin, the former Minneapolis police officer convicted of murdering Floyd, had 18 complaints filed against him before he killed Floyd, a USA Today report revealed. Minneapolis agreed to pay Floyd's family $27 million to settle any potential lawsuits, a massive figure the city pulled from a fund set aside for legal judgements and workers compensation claims.

Either through premiums to insurers who underwrite some or all settlements or through tax money set aside for them, taxpayers pay when officers are found to have acted inappropriately in hurting or killing someone. And they pay a lot.

Before the Chauvin settlement, Minneapolis paid $20 million to the family of a woman shot and killed by one of its police officers. The city of Louisville, Kentucky, paid Breonna Taylor's family $12 million to settle suits arising from her death at the hands of police officers.

In Palm Beach County, Dontrell Stephens got $6 million, a fraction of the $22 million a jury

**More:** Legislature OKs $6 million for Dontrell Stephens

**More:** Ex-police officer to appeal conviction in Corey Jones' death to state Supreme Court

**More:** Benjamin Crump, lawyer for George Floyd's family, a familiar name to Florida

West Palm Beach's police department monitors citizen complaints against its officers. Three complaints in a year triggers a review, said Dan Losey, an attorney who represents the West Palm Beach Police Department.

The Post reviewed a listing of citizen complaints from 2018 through 2020 and found that only two officers – Nicholas **Lordi** and Michael Rosario – had each drawn three complaints in a single year. Nelli drew two in 2020 and one each in 2019 and 2018.

## An inappropriate comment at a gas station draws a suspension

According to documents reviewed by The Post, one of the 2020 complaints stemmed from an incident at a gas station on Palm Beach Lakes Boulevard. A female clerk at the station asked Nelli to wear a mask when he entered the station store.

"Officer Nelli responded by placing the mask in his groin area and stating, 'Does he need a mask, too?' " internal police documents state.

Nelli, 36, was issued an eight-hour suspension.

It wasn't his first, and it wouldn't be his last.

He was suspended in 2014 after he was arrested in Palm Beach Gardens and charged with domestic battery. According to a Palm Beach Gardens police incident report, two witnesses said they saw Nelli grab his wife by the neck and slap her during an argument in a grocery-store parking lot.

Nelli was allowed to enroll in a court-approved batterer's intervention program and ordered to have no contact with his wife. A handwritten statement on the court document reads: "The defendant cannot have any weapons or ammunition."

Enrollment in the program allowed Nelli to avoid a sentence of 12 months of probation. He was suspended from the West Palm Beach Police Department for 48 hours.

Police documents show Nelli would be counseled or reprimanded eight more times before Adderley fired him after a review found he repeatedly signed up for outside overtime work

when he was supposed to be on duty.

## Police chief's letter details officer's lengthy infractions

On Aug. 17, 2020, Adderley summed up Nelli's infractions and punishments in a lengthy termination letter.

According to the letter, those infractions and punishments include:

- A written reprimand on Aug. 1, 2011, for a pre-operational check of his Taser.
- A written reprimand on Aug. 10, 2011, for failing to properly document his contact with a "suspicious person" near the city's water treatment plant.
- A written reprimand on June 23, 2012, for an at-fault accident with his patrol car.
- A written reprimand on May 6, 2013, for leaving the courtroom before one of the traffic cases he was involved in was heard.
- An eight-hour suspension on Aug. 26, 2013, for not attending traffic court and failing to notify the department of his absence.
- A 48-hour suspension on March 27, 2014, for his arrest for domestic battery.
- Verbal counseling on March 27, 2017, for losing his body camera after a chase and subsequent struggle with a suspect.
- A written reprimand on Sept. 14, 2017, for going "out of service without authorization of a supervisor and/or dispatch."
- A written reprimand on Nov. 6, 2017, for using profane language on the police radio.
- A written reprimand and retraining on May 30, 2017, for driving the wrong way on Interstate 95 during a vehicle pursuit.
- Verbal counseling on Jan. 24, 2019 for hitting a concrete median with his patrol car, damaging the vehicle's side and rim.
- A written reprimand on Jan. 26, 2019, for pursuing a driver who pulled off after a stop. Department notes said the pursuit "did not meet the department criteria."
- Verbal counseling on May 5, 2019, for failing to properly complete a report after stopping a juvenile and his friends. The juvenile's mother "alleged that her son and his friends were racially profiled." There is no indication in the documents reviewed by The Post that the woman's allegation was sustained or that Nelli was disciplined for racial profiling.
- An eight-hour suspension on May 18, 2020, for violating the department's standard of conduct policy after an investigation found that Nelli reacted with vulgarity when a female gas station clerk asked him to wear a mask when he entered the station store.

- Termination after a department investigation found that Nelli repeatedly worked outside overtime when he was supposed to be on duty.

"After reviewing his disciplinary history, I have determined that Officer Nelli has developed a pattern and practice of disregard for the policies and procedures of the West Palm Beach Police Department," Adderley wrote to Nelli. "Officer Nelli is terminated from employment."

## Arbitrator: Overtime issue was department's problem

Nelli was fired, but he wouldn't stay fired.

The Palm Beach County State Attorney's Office, with an eye toward possible criminal prosecution, had reviewed the allegations that Nelli repeatedly worked outside overtime when he was supposed to be on duty.

A June 3, 2020, report from the State Attorney's Office found that "Nelli repeatedly violated the police department's administrative overtime policy." But the report added that the department's computer tracking system "is flawed."

"Based on an interview of Nelli's immediate supervisor, Nelli had a reputation for his potential overtime policy violations," the report stated. "However, there was no known record that Nelli had been counseled or reprimanded for those overtime violations. In short, Nelli's actions had been officially condoned regardless of the written policy."

On Oct.13, the Palm Beach County Police Benevolent Association sought arbitration for Nelli, saying he was disciplined "without just cause."

Police union contracts often include a binding arbitration clause, meaning if a chief wants to fire an officer and the union wants the officer reinstated, the arbitrator has the final say. Markuns included the State Attorney's Office summary of the overtime investigation in his ruling and shared the view that the problem was the police department's time-tracking system.

Keeler said Adderley and his administration "targeted a long-time employee, unlawfully violated the contract by terminating this employee, violated this employee's rights in the process" and "thought they could get away with it."

Keeler described Nelli's case as "a shining example of why the PBA has disciplinary arbitration in our contracts. The PBA defends its contracts, plain and simple. If the Chief did

this to (Officer) Nelli today, he'll do it again tomorrow to another hard-working blue-collar worker."

## Chief: 'The arbitrator made a decision... we have to accept him back'

Adderley said he did not make his decision to fire Nelli lightly.

"Firing someone is the last option in my book," Adderley said. "You look at training. Is there something we can do? The city has a lot invested in this individual. If he doesn't succeed, then we fail."

Adderley said he has no choice but to accept the arbitrator's decision regarding Nelli. "He gets to come back and do his job," the chief said. "The arbitrator made a decision that is final. We have to accept him back."

And that, Adderley said, is one more reason why he does not believe civilian review boards are the answer to police oversight. "What would a civilian review board have done in this case?" he asked.

In Florida, court rulings and state law prohibit civilians from issuing subpoenas that would compel officers to respond. They can make a public records request for disciplinary actions and publicly call for more punishment or even termination.

But they can't require a police chief to take any action, and they can't erase the binding arbitration clause in union contracts.

Still, Herman Stevens Jr., a Delray Beach attorney, said he wants cities in Palm Beach County to form civilian review boards. He said he and others are working to set up a workshop in a couple of months that would allow residents to ask questions about review boards.

It is not enough, he said, to leave discipline up solely to police.

"Oftentimes, we've been left up to internal affairs, which I've likened to internal friends," Stevens said. "I question the intent. It's not objective."

Adderley said that, rather than work through a civilian review board, his preference is for residents to come to him if they have an issue with how he handled a particular case.

"My door is open," he said.

*wwashington@pbpost.com*

<span style="color:red">Exhibit 5</span>



# WEST PALM BEACH POLICE DEPARTMENT

## Standard Operating Procedure III-13

### USE OF FORCE/ INJURED PERSON INCIDENT

Revised: June 9, 2020

## I.  POLICY:

West Palm Beach Police Officers will use only the degree of force necessary to accomplish their lawful objectives. Officers must be reasonable in their actions when using any type of force. In situations involving non-lethal force, an officer should use physical force only when no other reasonably effective alternatives appear to exist before resorting to physical force. West Palm Beach Police Officers are authorized to use lethal force only when there is reason to believe such force is necessary to protect life or prevent or minimize great bodily harm.

The decision to use force "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. "In addition, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight…the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them."
Graham V. Connor, 490 U.S. 386 (1989)

## II.  DEFINITIONS:

***Control*** - Force used by an officer to influence or overcome the unlawful or physical resistance of a subject.

***Deadly Force*** - Force which is likely to cause death or great bodily harm.

***Force Continuum*** - A term used to designate appropriate conduct for an officer when using force to establish control of a resisting subject. The level of force necessary to establish control is directly related to the level of resistance an individual is exerting.

***Great Bodily Harm*** - Physical injury suffered by the victim of a violent act that creates a substantial risk of death, extended loss or impairment of a body part or function, or permanent disfigurement.

***Injured Person Incident*** – When a person is injured prior to police contact and is subsequently arrested, Baker Acted or otherwise taken into custody without any use of force; or, is injured as a result of flight from police presence without any use of force; or, is injured while in police custody without any use of force.

***Non-Deadly Force*** - Force that is not likely to cause death or great bodily harm.

***Non-Deadly Weapons*** - Department approved weapons which, when used consistent with training procedures, should not cause death or great bodily harm.

***Objectively Reasonable -*** The determination that the necessity for using force and the level of force used is based upon the officer's evaluation of the situation in the light of the totality of the circumstances known to the officer at the time the force is used and upon what a reasonably prudent officer would use under the same or similar situations.

***Probable Cause (Reasonable Belief)*** – A reasonable belief a person has committed a crime. It is the standard that must be met for an arrest warrant to be issued, for an individual to be searched, or for an individual to be taken into custody by the police.

***Resistance*** - The subject's attempt to evade an officer's attempts to control them.

## III.   USE OF FORCE CONTINUUM:

**A**.  The officer's levels of Control:

**1**.   Officer presence, identification of authority

**2**.   Verbalization skills - commands of direction or arrest

**3**.   Soft Control Techniques - techniques used to overcome resistance which offer a minimal chance of injury to the officer and involved subject(s) but offer a high probability of control. Examples include:

    **A**.   Escort position

    **B**.   Pressure points

    **C**.   Empty hand joint locks

    **D**.   Assisted empty hand arm locks using impact weapons

    **E**.   Handcuffing and/or supplemental restraints

**4**.   Aerosol Subject Restraint ASR/OC and the Electronic Control Device (ECD) may be used:

    **A**.   When soft control techniques in all likelihood will fail

    **B**.   When hard control techniques in all likelihood will lead to injury

**5**.   Hard Control Techniques – Techniques used to overcome resistance which when used, have a higher probability of injury to the officer and/or subject(s) involved and offer a higher probability of control. Examples include:

    **A**.   Punches, strikes, and kicks

     **B**.   Impact weapon strikes

     **C**.   Non- Deadly force

     **D**.   Canines (K-9)

   **6**.   Lethal Force - Force likely to cause death or great bodily harm.

# IV.   LEVELS OF RESISTANCE:

**A**.   Subject's Actions:

   **1**.   Psychological Intimidation - nonverbal cue indicating the subject's attitude, appearance, and physical readiness to resist or fight.

   **2**.   Verbal noncompliance - verbal responses indicating unwillingness to comply, or threats.

   **3**.   Passive resistance - physical actions that do not prevent the officer's attempt to control and no attempt is made to harm the officer (example: protest sit-in.)

   **4**.   Defensive resistance - physical actions which attempt to prevent the officer from gaining control, but no attempt is made to harm the officer, (example: a person simply clutches his or her arms tightly to the chest to prevent the application of handcuffs.)

   **5**.   Active aggression - physical actions of assault.

   **6**.   Aggravated active aggression - lethal force encounter.

**B**.   Officer's Perception of Danger and Level of Resistance:

   **1**.   When an officer determines he or she must use force, the level of force used is dependent upon the officer's perception of the resistance and/or whether the resistance is placing the officer or others in jeopardy of serious injury or death.

   **2**.   When an officer's presence and verbal direction are not successful in establishing control, the officer is trained to escalate the level of control.

     **A**.   Escalating the level of control is accomplished by using the "One Plus One Theory" of escalation and only escalating to the next level of force which is justified and/or necessary considering the amount of resistance given and the potential for injury to the subject by using that type of control.

# V.   USE OF NON-DEADLY FORCE:

**A**.   All force used by any member, whether it is deadly or non-deadly, will be only the force necessary to accomplish lawful objectives. Use of physical force should be discontinued when resistance ceases or when the incident is under control.

**B**.   Non-Deadly force may be used by a member, when necessary:

    **1**.   To effect an arrest

    **2**.   To overcome resistance to an arrest

    **3**.   In self-defense

    **4**.   To prevent an escape

    **5**.   To perform other official duties

**C**.   Any member applying non-deadly force as defined in this policy is prohibited from using a lateral vascular neck restraint. The use of lateral vascular neck restraint can only be utilized when deadly force is authorized, and all other reasonable means of defense have been exhausted.

**D**.   When any type of non-deadly force is used or any action is taken resulting in the injury or death of a person, the member using the force immediately or immediately after the situation or person is brought under control, notifies a supervisor to respond to the scene.

**E**.   Dispatch Operations and a Supervisor are contacted immediately to summon medical aid when the use of force results in injury which requires immediate medical care.

**F**.   Non-Violent Civil Rights Demonstrations: use of lethal force or any force beyond which is necessary for officers to accomplish their lawful objectives is prohibited against any individuals engaged in nonviolent civil rights demonstrations.

    **1**.   Applicable state and local laws prohibiting physically barring entrance to, or exit from, any facility or location that is the subject of a nonviolent civil rights demonstration will be enforced.

**G**.   **Handcuffed individuals**: Physical force shall not be used against individuals in restraints, except as objectively reasonable to prevent their escape or prevent imminent bodily injury to the individual, the officer, or another person. In these situations, only the minimal amount of force necessary to control the situation shall be used.

**H**.   **Duty to Intervene**: An officer has a duty to intervene to prevent or stop the use of excessive force by another officer when it is safe and reasonable to do so.

# VI.   USE OF DEADLY FORCE:

**A**.   An officer is authorized to use deadly force when it is objectively reasonable under the totality of the circumstances. Use of deadly force is justified when one or both of the following apply:

    **1**.   To protect the officer or others from what is reasonably believed to be an immediate threat of death or serious bodily injury.

Original issue:  February 4, 1989                       Use of Force/Injured Person Incident
Revised:         June 9, 2020                                SOP III-13
Page 4 of 11

    **2.** To prevent the escape of a fleeing subject when the officer has probable cause to believe the person has committed or intends to commit a felony involving serious bodily injury or death and the officer reasonably believes there is an imminent risk of serious bodily injury or death to the officer or another if the subject is not immediately apprehended.

**B.** Where feasible, the officer shall identify himself or herself as a law enforcement officer and warn of his or her intent to use deadly force.

**C.** Officers using force will use only the degree of force necessary to accomplish their lawful objectives.

**D.** Dispatch Operations is contacted immediately to summon medical aid when the use of force results in injury which requires immediate medical care.

## VII.  USE OF FIREARMS:

**A.** Members are not justified in the use of a firearm against a misdemeanor offender unless a misdemeanor arrest escalates to the point the officer must defend himself or herself or another from death or great bodily harm.

**B.** A member may use a firearm to destroy an animal for self-defense or to prevent substantial harm to another.

    **1.** When an animal is injured or killed, the member will contact his or her supervisor immediately and notify them of the situation.

    **2.** Palm Beach County Animal Control is requested to respond and care for the injured animal or dispose of the dead animal.

    **3.** The member will make a concerted effort to contact the owner.

    **4.** When an animal is destroyed by a member, a review is conducted by the member's Shift Commander as described in SOP # IV-22.

**C.** Members are prohibited from shooting a firearm when it appears likely an innocent person may be injured, except in a life-threatening situation to the member or another.

**D.** Firearms shall not be discharged at a moving vehicle unless:

    **1.** A person in the vehicle is threatening the officer or another person with deadly force by means other than the vehicle.

    **2.** The vehicle is operated in a manner deliberately intended to strike an officer or another person, and all other reasonable means of defense have been exhausted (or are not present or practical), which includes moving out of the path of the vehicle.

    **3.** An employee will not create circumstances where the use of deadly force becomes necessary by intentionally standing and/or stepping into the path of a suspect's vehicle.

**E.**   Revolvers are fired double action at all times.

**F.**   Nothing in this procedure will preclude a member to un-holster and display his or her firearm when the possibility of danger to anyone exists.

**G.**   Under no circumstances will a warning shot be fired by a West Palm Beach Police Officer.

**H.**   When a member discharges a firearm on or off duty, other than for training or recreational purposes, the member will notify a supervisor of the incident.

   **1.**   This includes all incidents involving accidental or unintentional discharge of any firearm registered with the Department as a primary firearm, secondary or back up firearm, shotgun, or off-duty firearm.

   **2.**   A supervisor will respond to the scene of the incident.

   **3.**   The member will complete a report of the circumstances surrounding the firearm discharge so an investigation may be completed (SOP # IV-22).

**I.**   Dispatch Operations is contacted immediately to summon medical aid when the use of force results in injury which requires immediate medical care.

# VIII.   PROCEDURE FOR CONTROL OF PERSONS REPORT:

**A.**   The incidents which require a Control of Person's Report are:

   **1.**   When as a result of using a police canine for apprehension a person is injured.

   **2.**   When physical force is used on any person including, but not limited to:

      **A.**   When a person is charged with resisting arrest as a result of physical contact with an officer.

      **B.**   When there is any observable injury or complaint of injury to any subject(s) or police member(s) as a result of physical contact between the subject(s) and member(s).

      **C.**   When a member strikes a subject with an impact weapon, any body part or other object.

      **D.**   When a member applies force through the use of lethal or less than lethal weapons whether an injury occurs or not.

   **3.**   When a firearm is discharged on or off-duty other than for training or recreational purposes.

      **A.**   When the discharge of a firearm is accidental and no control of persons is involved, the officer's Shift Commander will complete a report in memorandum form. A copy is forwarded to the Training Section for review

    **B**.  When there is a discharge of a firearm, intentional or accidental, during a control of person's incident, the Shift Commander will notify the Critical Incident Team (CIT) Commander of the incident immediately.

        **I**.  The CIT Commander will determine who will investigate the incident

    **C**. The IAU Commander is notified any time a weapon is discharged by sworn personnel of the Department, excluding training or recreational activities.

        **I**.  The IAU Investigator(s) will respond to police shootings where injury is involved

**4.**  When a death results from a control of person's incident, the Criminal Investigations Division/Critical Incident Team and FDLE is called to investigate the incident.

    **A**.  The IAU Commander is notified any time an in-custody death occurs.

        **I**.  The IAU Investigator(s) will respond to all police in-custody death cases

**B**.  It is the responsibility of the member involved in a Control of Persons incident (using any force) to report it to his or her supervisor immediately after the incident is brought under control.

    **1.**  The supervisor and/or involved member will notify the Shift Commander.

        **A**.  Any time a member uses force or takes any action which results in alleged or actual injury, he or she is required to submit a written report documenting the incident.

        **B**.  The Shift Commander is responsible to assure the IAU and the chain of command, up to and including the Chief of Police, is notified when a police officer is involved in a shooting incident or an in-custody death occurs.

**C**.  The Shift Commander of the involved member is responsible for completing the Control of Persons Report on the current Department software program.

    **1.**  The following steps are followed when completing the investigation:

        **A.**  The Shift Commander will respond to the scene and assume command and ensure medical treatment if necessary.

        **B**.  All subjects and identified witnesses are interviewed documenting the following:

            **1.**  What they said occurred.

            **2.**  Behavior of the subjects (Normal, irrational, intoxicated, etc.)

            **3.**  Possible drug or alcohol use.

            **4.**  Any visible or complaint of injury.

        **C**.  All of the involved officers complete a narrative report describing their involvement and the subject's resistance.

      **D**.  Any video evidence is collected.

      **E**.  Photographs are taken of the subject to include a full body photograph, front and back, depicting any and all injuries and any markings on clothing.

**2**.  In the absence of a supervisor from the involved member's Division, the Shift Commander for the division the incident occurred in will complete the report.

      **A**.  When the Control of Persons Report is written by a Section/Shift Commander not in the same Division as the member involved, the report is submitted through the chain of command of the Division in which the member works.

**D**.  When completed all control of persons reports and accidental discharge memorandums are forwarded to Internal Affairs.

  **1**.  When an Internal Affairs Investigation is requested, the request is forwarded along with the Control of Persons Report to the IAU Commander.

  **2**.  The aggregate of all Control of Persons Reports (Use of Force) are submitted to the Chief of Police and staff for review on a semi-annual basis.

# IX.   PROCEDURE FOR INJURED PERSON INCIDENT:

**A**.  Should a person subjected to any use of force complain of any injury, any injury is observed, or there is any indication of injury, EMS will be immediately requested.

**B**.  Incidents which require an Injured Person Report are:

  **1**.  When a person is injured prior to police contact and is subsequently arrested, Baker Acted or otherwise taken into custody without any use of force.

  **2**.  When a person is injured as a result of flight from police presence without any use of force.

  **3**.  When a person is injured while in police custody without any use of force.

  **4**.  When a person is injured or alleged to have been injured as a result of police contact without any use of force.

**C**.  It is the responsibility of the member involved in an injured person incident to report it to his or her supervisor immediately after the incident is brought under control.

  **1**.  The supervisor and/or involved member will notify the Shift Commander.

**D**.  The Shift Commander of the involved member is responsible for completing the Injured Persons Report on the current Department software program.

  **1**.  The following steps are followed when completing the investigation:

      **A**.  The Shift Commander will respond to the scene and assume command and ensure medical treatment, when necessary,

Original issue:  **February 4, 1989**                    Use of Force/Injured Person Incident
**Revised:**        **June 9, 2020**                                  SOP III-13
Page 8 of 11

    **B.**  All subjects and identified witnesses are interviewed,

        **1.**  If there is a claim of a use of force, a Control of Persons Report is required in lieu of an Injured Person Report

    **C**.  All involved officers will complete narrative reports describing their involvement and the circumstances of the injury.

    **D**.  Any video evidence is collected.

    **E**.  Photographs are taken of the subject to include a full body photograph front and back, depicting any and all injuries and any markings on clothing.

**2.**  In the absence of a supervisor from the involved member's Division, the Shift Commander for the division the incident occurred in will complete the report.

    **A.**  When the Injured Persons Report is written by a Section/Shift Commander not in the same Division as the member involved, the report is submitted through the chain of command of the Division in which the member works.

**E**.  When completed all Injured Persons Reports are forwarded to Internal Affairs Unit.

# X.   USE OF FORCE REVIEW BOARD:

**A**.  The Use of Force Review Board shall review the following incidents:

    **1**.  At the direction of the Chief.

    **2**.  At the direction of the Captain in command of the involved officer.

    **3**.  That result in serious bodily injury, sutures, broken bones, or other excessive injuries.

    **4**.  That involved use of force on a minor resulting in injury.

    **5**.  Involving the discharge of any firearm, at any time other than firearms training.

    **6**.  Resulting in any injury caused by a WPB Canine

**B**.  Exception Cases that meet the criteria for the Use of Force Review Board but are already assigned to Internal Affairs or Criminal Investigations for investigation shall not be forwarded to the Use of Force Review Board unless authorized by the Chief, or his designee.

**C**.  Board Composition: The Use of Force Review Board shall be a standing board consisting of the following nine members:

    **1**.  Legal Advisor

    **2**.  Three members of the Training Division including the Sergeant and Range Master.

    **3**.  A member of Internal Affairs

Original issue:  February 4, 1989                 **Use of Force/Injured Person Incident**
Revised:        June 9, 2020                      **SOP III-13**
                                             **Page 9 of 11**

    4.   A Field Training Officer

    **5**.  A union representative

    **6**.  Member of Command Staff

    **7**.  Member of  S.W.A.T.

    **8**.  Alternate members, will be appointed by the Legal Advisor when an assigned board member is unavailable, or a conflict exists preventing an assigned member from serving on the Review Board.

**D**.  Board Responsibilities

    **1**.  The Use of Force Review Board will evaluate, in explicit and fact-finding fashion, each aspect of the response brought before them.

    **2**.  The Use of Force Review Board shall review the actions of all members involved in the use of force incident, not just the actions of the member(s) who used force.  The action(s) of the member(s) leading up to and following the use of force shall be reviewed to identify commendable actions and/or conduct warranting corrective intervention by the WPBPD and, as appropriate recommend training.

    **3**.  The Use of Force Review Board shall review use of force incidents with respect to the following:

        **A**.  Compliance with WPBPD policies, procedures, directives, and training.

        **B**.  Whether proper tactics were used by the involved member(s).

        **C**.  Risk management issue(s).

        **D**.  Adequacy of related WPBPD training.

        **E**.  Whether the level of force used was appropriate for the incident.

    **4**.  The Chairperson shall determine the date, time, and location of the meetings.

    **5**.  The quorum for each Use of Force Review Board proceeding shall be four members.

**E**.  The Use of Force Review Board will develop findings and make recommendations approved by the majority vote in a report to the Chief as to the following:

    **1**.  No further action is necessary

    **2**.  The incident warrants further investigation by Internal Affairs

    **3**.  Training is required for any person involved

**F**.  The Chief, or designee, shall make the final decision regarding any action to be taken against any officer involved in any Use of Force situation.

## XI.  REFERENCES:

- SOP # III-14 Weapons and Ammunition.
- SOP # III-15 Aerosol Subject Restraint.
- SOP # III-16 Less-Lethal Launched Ammunition and Ordnance System.
- SOP # III-25 Vehicle Pursuits.
- SOP IV-5 Critical Incident investigation
- SOP # IV-22 Internal Affairs Function.
- SOP # IV-28 Canine Team Function.
- Florida State Statutes Chapter 776 Justifiable Use of Force.

**Approved:**

*Signature on file*                                                        *June 9, 2020*
**Frank Adderley, Chief of Police**                                **Date:**

**Exhibit 6**

## IN THE CIRCUIT COURT IN THE FIFTEENTH JUDICIAL CIRCUIT IN AND FOR PALM BEACH COUNTY, FLORIDA

| Agency **FDLE** | Report No. **MI-14-0288** | Arresting / Submitting Agent **Special Agent Lisa M. Lamey** | |
|---|---|---|---|
| Day / Date / Time of Arrest | | Place of Arrest | |

| Agency ORI | OBTS | ■ Adult | ☐ Juvenile |
|---|---|---|---|

■ COMPLAINT  ☐ ARREST  ☐ WARRANT:  ☐ IN COUNTY  ☐ OUT OF COUNTY

In the **Fifteenth Circuit** of the State of Florida, the undersigned affiant swears that she has just and reas grounds to believe that on August 22, 2017 in the vicinity of **Palm Beach County**, Florida.

| Name (Last, First, Middle) **Lordi, Nicholas, Salvatore** | DOB | Race /Sex | Alias |
|---|---|---|---|
| Address | | | Phone |
| JUV – Parent / Guardian **N/A** | | | Phone **N/A** |

| Height | Weight | Eyes | Hair | Build | Complexion | Speech |
|---|---|---|---|---|---|---|
| Driver license (state & number) | | | Social security number | | Place of Birth | |
| Occupation | | | Employer | | | |
| Scars / Marks /Tattoos | | | | | Marital status **Unknown** | |

| Committed offense(s) of | FSS | Level/degree |
|---|---|---|
| 1. **Aggravated Battery** | **784.045 (1)(a)1** | 2ⁿᵈ Degree Fe |
| 2. | FSS | Level/degree |
| 3. | FSS | Level/degree |
| 4. | FSS | Level/degree |
| 5. | FSS | Level/degree |
| 6. | FSS | Level/degree |

Sworn to and subscribed before me, the undersigned authority,
this 15 day of February 2022

_Lisa M. Lamey_                    _TChahine_

Affiant    Law Enforcement Officer

☐ Personally Known
■ Produced

TARA CHAHINE
Commission # HH 022187
Expires August 9, 2024
Bonded Thru Budget Notary Services

NOTARY PUBLIC
STATE OF FLORIDA

NOT A CERTIFIED COPY

**IN THE CIRCUIT COURT IN THE FIFTEENTH JUDICIAL CIRCUIT IN AND FOR PALM BEACH COUNTY, FLORIDA**

| | | |
|---|---|---|
| ████████████ | | |
| Co-Defendant | DOB | Race/Sex |
| C0-Defendant | DOB | Race/Sex |
| Victim **John Monroque** | DOB **07/23/1956** | Race/Sex **Black/Male** |
| Victim | DOB | Race/Sex |
| Victim | DOB | Race/Sex |
| Victim | DOB | Race/Sex |

☐ **No Bill / Petition**   ■ **Issue Warrant/Prosecution**   ☐ **Approved**

_____   __2-15-22__

Signature of Assistant State Attorney  /  Date

Introduction of Affiant

Your Affiant, Special Agent (SA) Lisa M. Lamey, is an investigative or law enforcement officer of the State of Florida, who is empowered by law to conduct investigations of and make arrests for, offenses enumerated under Florida State Statutes. Your Affiant has been a Special Agent (SA) with the Florida Department of Law Enforcement (FDLE) since September 2018. Prior to that, Your Affiant was a Special Agent with the Federal Bureau of Investigation (FBI) for approximately twenty-two (22) years. Prior to that, Your Affiant spent five (5) years as a Deputy Sheriff with the Broward Sheriff's Office. Currently, Your Affiant is assigned to the FDLE Miami Regional Operation Center, Broward Field Office, conducting general investigations. SA Lamey has received training and has participated in the investigation of violent offenses and police use of force investigations.

Statement of Facts

The facts and information, obtained by Your Affiant with regard to this matter, comprise proofs to establish such Probable Cause, duly submitted as follows:

The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement witnesses, civilian witnesses, and video evidence. Since this affidavit is being submitted for the limited purpose of securing an arrest warrant, Your Affiant has not included each and every fact, or detail, of this investigation. Your Affiant has set forth only the facts that are necessary

**IN THE CIRCUIT COURT IN THE FIFTEENTH JUDICIAL CIRCUIT IN AND FOR PALM BEACH COUNTY, FLORIDA**

to establish probable cause to believe that Nicholas Salvatore Lordi committed a violation of Florida State Statue §784.045(1)(a)1.

In May 2020, the West Palm Beach Police Department (WPBPD) requested the assistance of the Florida Department of Law Enforcement (FDLE) to investigate a non-deadly use of force incident by ██████████████ Nicholas Salvatore Lordi (Ofc. Lordi) against John Monroque (Monroque). The use of force incident had occurred on Friday, November 1, 2019, at the Food Plus grocery store, located at 5501 Broadway, West Palm Beach, Florida 33407. Monroque had sustained non-fatal injuries as a result of the incident, and video footage of the incident had been recently posted on Instagram. The video footage was approximately nine (9) minutes and three (3) seconds in duration and was recorded via surveillance cameras at the Food Plus grocery store.

A thorough review of the video footage recorded at the Food Plus grocery store, as well as a thorough review of body worn camera (BWC) video footage recorded by ███ Lordi's and WPBPD Officer Jamesloo Charles' (Ofc. Charles) BWCs was conducted.

The video footage, confirmed by WPBPD computer aided dispatch (CAD) reports, revealed that ███ Lordi and Ofc. Jamesloo Charles responded to the Food Plus grocery store and made contact with Monroque in regard to a trespassing incident. Ofc. Charles then obtained Monroque's identification and went to his marked police car to query Monroque via his mobile data terminal.

In the video, after speaking with Monroque for at least one (1) minute and thirty (30) seconds, ███ Lordi approached Monroque, raised his right hand, and then placed his arms around Monroque, in the area of Monroque's waist. Ofc. Lordi then moved Monroque to the hood of Ofc. Charles' WPBPD marked police car and pushed Monroque's head onto the hood of the car.

A struggle then ensued between Monroque and ███ Lordi and Charles, as the ███ attempted to place handcuffs on Monroque, and Monroque did not allow himself to be handcuffed.

During the struggle, ███ Lordi pulled Monroque backward, onto the ground. While on the ground, and while ███ Lordi was lying on his back, with Monroque also lying on his back and partially on top of ███ Lordi, ███ Lordi stuck Monroque, in the area of Monroque's head and face, with the closed fist of his left hand approximately six (6) times. At this time, ███ Lordi had Monroque's head secured in a headlock, using his right arm. Monroque's hands were not underneath his body and Monroque was not striking ███ Lordi or any other person.

███ Lordi then rolled and mounted Monroque, who was then lying on the ground, on his stomach, with his left hand in front of his face. ███ Lordi struck Monroque approximately five (5) additional times in the area of Monroque's head and face using the closed fists of both his right and left hands. As ███ Lordi struck Monroque in the head and face, Monroque's left hand remained in front of his own face.

███ Lordi stopped striking Monroque when an unidentified individual intervened and blocked ███ Lordi from striking Monroque. Ofc. Charles then moved the individual away from ███ Lordi and Monroque, and removed his handcuffs from their pouch on the right side of his duty belt. At that time, ███ Lordi was still mounted on Monroque's back, using

**IN THE CIRCUIT COURT IN THE FIFTEENTH JUDICIAL CIRCUIT IN AND FOR PALM BEACH COUNTY, FLORIDA**

his right hand to hold Monroque's head on the ground. ██ Lordi then moved Monroque's left hand from its position in front of Monroque's face as ██ Charles handcuffed Monroque, to the front of Monroque's body. ██ Lordi then disengaged from Monroque.

After being handcuffed, and while lying on the ground, Monroque appeared to be motionless for approximately forty-seven (47) seconds.

Approximately two (2) minutes and forty (40) seconds later, as Monroque lay handcuffed on the ground, ██ Lordi could be heard telling Monroque to "stop spitting," and "stop your shit, man, just stop." ██ Lordi then placed his right knee on Monroque's head, holding Monroque's head against the ground for approximately fourteen (14) seconds. ██. Lordi then removed his knee from Monroque's head and disengaged from Monroque.

Monroque was subsequently transported to St. Mary's Medical Center for medical care.

A review of Monroque's medical records from St. Mary's Medical Center, obtained via a medical release form signed by Monroque, stated that Monroque had sustained a "closed fracture of [his] nasal bones."

In September 2021, Monroque provided a sworn statement to FDLE Special Agents in which he stated that as ██ Charles was "running" his identification (in Ofc. Charles' police car), ██ Lordi had "jumped on [his] back and punched [him] in the nose/face, breaking [his] nose." Monroque further stated that ██ Lordi had "slammed" his forehead on the hood of the police car. Monroque stated that he had trouble remembering what happened after that, as he had become "unconscious."

In July 2020, ██ Lordi provided a deposition in which he stated that he had responded to a call for service at the Food Plus grocery store, in regard to a "suspect loitering," who had been intoxicated, and who had been asked to leave the store, but who had refused to leave. ██ Lordi stated that upon arrival at the store he had made contact with the individual, later identified as Monroque.

██ Lordi described Monroque's behavior as "disrespectful towards [him]" and "towards [his] partner," and stated that during his interaction with Monroque, he had "tried to grab Monroque to keep Monroque in front of [him]," at which time, Monroque began "fighting, pulling away, and not listening to commands."

██ Lordi stated that during the interaction, when Monroque "began grabbing" Ofc. Charles' magazine (ammunition), the officers had had to use force against Monroque. Specifically, ██ Lordi stated that he "had to take [Monroque] to the ground."

██. Lordi stated that once on the ground, Monroque had been "laying on his hands" and "[wouldn't] put his hands behind his back."

It should be noted that the aforementioned video evidence contradicted this statement, as Monroque's hands could be observed to be above his body in the video footage.

During his deposition, ██ Lordi did not make a statement about striking Monroque while Monroque was lying on top of ██ Lordi, and while ██. Lordi employed a

**IN THE CIRCUIT COURT IN THE FIFTEENTH JUDICIAL CIRCUIT IN AND FOR PALM BEACH COUNTY, FLORIDA**

headlock on Monroque. However, ▮ Lordi did state that when he was fully mounted on top of Monroque, he had delivered "a few softening strikes to [Monroque's] face" with a closed fist. ▮Lordi stated that he could not remember if Monroque had been trying to punch him (▮ Lordi) when he (▮ Lordi) had delivered these strikes to Monroque.

▮ Lordi stated that after striking Monroque and placing Monroque in handcuffs, "No more force was needed. No more force was used."

It should be noted that the aforementioned video evidence contradicted this statement, as ▮ Lordi could be observed placing his knee on Monroque's head as Monroque lay handcuffed on the ground in the video footage.

Based on these facts, Your Affiant believes that ▮ Lordi did actually and intentionally touch and/or strike another person, that being John Monroque, against the will of the other; and that ▮ Lordi intentionally or knowingly caused great bodily harm, permanent disability, or permanent disfigurement to John Monroque, that being a broken nasal bone.

Based on these facts, Your Affiant further believes that ▮ Lordi used force in excess of that which was necessary to mitigate the incident, to place Monroque under arrest, and/or to protect himself or others, when he struck Monroque in the area of the head and face approximately eleven (11) times.

Based on these facts, Your Affiant additionally believes that once Monroque was handcuffed and lying on the ground, ▮ Lordi used force in excess of that which was necessary to mitigate the incident, to place Monroque under arrest, and/or to protect himself or others, when he placed his knee on Monroque's head.

Therefore, based on the above listed facts, Your Affiant believes that probable causes exists for the offense of Aggravated Battery in violation of Florida State Statute Florida State Statue §784.045 (1)(a)1, and respectfully requests that this arrest warrant be granted.

The offense set forth in the foregoing Affidavit is contrary to the statute(s) in such case made and provided, and against the peace and dignity of the State of Florida.